MUNICIPALITY OF ANCHORAGE and the Anchorage Water & Wastewater Utility, Appellants/Cross–Appellees,

v.

The FRANK COLUCCIO CONSTRUC-TION COMPANY, Appellee/Cross–Appellant, Appellant,

v.

CH2M HILL NORTHWEST, INC. an Oregon corporation, Appellee.

Nos. S–3898, S–3844, S–4203 and S–4267.

Supreme Court of Alaska.

Feb. 7, 1992.

Ann Resch and James E. Ramsey, Deputy Mun. Attys., Anchorage, and William J. Bender and David B. Adler, Skellenger, Bender, Mathias & Bender, Seattle, Wash., for Municipality of Anchorage.

Jeffrey Smyth, Adolph & Smyth, Seattle, Wash., and Edgar R. Locke, Beaty, Draeger, Locke & Troll, Anchorage, for Frank Coluccio Const.

D.K. "Kirby" Wright, Jr., Hintze, Herrig & Wright, Seattle, Wash., for CH2M Hill Northwest.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This appeal arises from a contract dispute between Frank Coluccio Construction Company, on the one hand, and the Municipality of Anchorage, The Anchorage Water and Wastewater Utility, and CH2M Hill Northwest, on the other. The construction company sued the other parties after they denied its claim for equitable adjustment of contract price based on encountering differing site conditions. After both an arbitration proceeding and a jury trial, Frank Coluccio Construction obtained a verdict of breach of contract and an award of damages. The case comes before this court on various appeals and cross-appeals.

## I

The facts of this contract dispute pertain to three rather discrete controversies. The first controversy concerns the conduct of a jury trial with Frank Coluccio Construction Company (FCCC) as plaintiff against defendants Municipality of Anchorage and The Anchorage Water and Wastewater Utility (collectively referred to as MOA). The second controversy involves the same parties, but concerns FCCC's claims for costs and fees arising out of the trial and a prior arbitration proceeding. The final controversy is between FCCC and CH2M Hill Northwest, Inc. (CH2M Hill), who was originally a defendant in FCCC's underlying suit; the present dispute arises from the award of costs and fees to CH2M Hill after it won summary judgment against FCCC.

## A

In September 1986 FCCC was successful bidder on a $5 million, fixed-price contract for construction of an "effluent tunnel" at Point Woronzof. The 2700 foot tunnel was to be constructed through use of a tunnel boring machine. Because the project involved use of federal funds, the contract included a federally mandated "differing site conditions" (DSC) clause:

(a) The contractor shall promptly, and before such conditions are disturbed, notify the recipient in writing of:

(1) Subsurface or latent physical conditions at the site differing materially from those indicated in this subagreement, or

(2) Unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this subagreement.

(b) The recipient shall promptly investigate the conditions. If it finds that conditions materially differ and will cause an increase or decrease in the contractor's cost or the time required to perform any part of the work under this subagreement, whether or not changed as a result of such conditions, the recipient shall make an equitable adjustment and modify the subagreement in writing.

Such clauses, which have long been staples of federal contracts, are intended "to prevent bidders from increasing their bid prices to protect against misfortunes resulting from unforeseen developments, and thus avoid turning a construction contract into a 'gambling transaction.'" *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 50 (1983) (citation omitted).

FCCC began preliminary work in January 1987 and began boring the tunnel on

March 26, 1987. On April 21, 1987, after completing about 850 feet of tunneling, FCCC encountered "running ground," which it considered a DSC.[1] Similar conditions were encountered about 100 feet farther on. In order to deal with the running ground, FCCC modified its tunnel boring machine and changed its tunneling methods. Pursuant to the DSC clause, FCCC sought equitable price adjustments of more than $3.8 million for increased expenses caused by the running ground. MOA denied the claims in their entirety, apparently on the basis that FCCC encountered no ground condition that differed materially from what was indicated in the contract.

FCCC then sued MOA and CH2M Hill, which had provided design and construction management services to the municipality. FCCC alleged breach of contract by MOA in not making an equitable adjustment under the DSC clause and in failing to disclose all material information in regard to the contract; unjust enrichment by MOA in receiving the benefit of the extra work done by FCCC to deal with the running ground; breach of implied warranty of suitability of plans and specifications by MOA and CH2M Hill; negligence by MOA and CH2M Hill in designing the plans and specifications and in disclosing material information; and fraudulent misrepresentation by MOA of site conditions. The fraud claim was eventually dismissed by stipulation of the parties.

**B**

In September 1988 FCCC, MOA, and CH2M Hill entered into an "Agreement to Arbitrate." They declared that they "entered into this Agreement in order to resolve the enumerated complex entitlement issues involved in this dispute expeditiously and dispositively, by submitting these issues to a panel of experts." The agreement recited the parties' intent that the arbitration panel's resolution of "liability/entitlement issues" be "binding and nonappealable." It provided that the arbitrators would be non-attorneys with "expertise in the field of tunneling technology and design and underground construction."

After outlining fairly specific procedural guidelines, the agreement addressed the arbitrators' product:

### III. AWARD

The decision shall be in writing, signed by the arbitrators, and shall state the disposition of the case, identifying the prevailing party. It shall not allocate fault, if any, by percentage between the defendants. Dissent may be noted and identified.

. . . .

3.2 *Findings of Fact and Conclusions of Law.* The panel shall enter formal Findings of Fact and Conclusions of Law to identify its decision-making process. The participants shall each, after the panel renders its written decision, prepare and submit proposed Findings of Fact and Conclusions of Law to the panel, from which the panel shall assemble an appropriate document. All members of the panel shall execute the adopted Findings of Fact, noting and identifying dissent, if appropriate. The executed Findings of Fact and Conclusions of Law shall be the arbitrators' final decision for purposes of AS 09.43, et seq.

. . . .

3.5 *Disposition of Decision.* Upon application of a party, the decision may be filed with the Superior Court of the State of Alaska, to become an official part of the record of proceedings. Upon application of a party, the Court shall confirm the decision pursuant to AS 09.-43.110 unless, within the time limits imposed by AS 09.43.120 and AS 09.43.130, grounds are urged for vacating or modifying or correcting the decision.

---

1. Frank Coluccio testified at trial:

   Stand-up ground is ground that will stand up [for] a minute or two so that our [tunnel boring machine] can go forward. And it only takes a minute or two to go forward. . . .

   But then if you got different kind of ground, like—like say the Sahara Desert where it's just sand, it just flows. Or like sugar. . . . That's running ground and flowing ground.

The superior court approved and ratified the arbitration agreement on December 2, 1988.

The arbitration took place shortly thereafter. As specified by the arbitration agreement, the proceedings were fairly formal: extensive discovery was undertaken prior to the hearings; counsel represented the parties; the witnesses testified under oath; and each side presented engineering and tunneling experts. After considering the evidence and arguments, the arbitrators rendered detailed "Findings of Fact and Conclusions of Law" [2] (Findings) and a brief "Award of Panel of Arbitrators" (Award). The crux of the panel's findings was that

> the physical index properties of the materials actually encountered in the excavation of the tunnel did not differ materially from those indicated in the Subagreement (contract), nor from those reasonably to be expected by an experienced, prudent contractor.
>
> 43. However, the Arbitrators find that in certain reaches of the tunnel, the ground behavior was materially different from the behavior indicated in the Subagreement (contract) and from that which could reasonably be expected by an experienced, prudent contractor. Specifically, FCCC encountered running ground conditions more severe than could have been anticipated or than were indicated in the Subagreement (contract).

The panel concluded that the unexpected ground behavior "constitute[d] a differing site condition as provided in the Differing Site Conditions Clause set forth in the contract."

Having thus found that a compensable DSC existed, the panel went on to express its view that FCCC had not acted in an entirely reasonable and prudent manner in its preparations for undertaking the tunnel construction. In essence, the panel felt that FCCC should have foreseen the possibility of some running ground, even though it could not reasonably have foreseen the severity of the condition. The panel particularly cited FCCC's failure to take into account the experience it had obtained during a project on similar terrain in Washington; its failure to seek the advice of the boring machine's manufacturer concerning the physical characteristics indicated by the contract documents; and its failure to reconsider its configuration of the machine before beginning to tunnel, in light of a sample shaft excavated in January 1987. The panel concluded these criticisms by noting that they "attach[ed] great weight to the failure of FCCC to take any mitigating steps to reduce the impact of a possible encounter with limited running ground conditions prior to placing the Lovat TBM in the ground at the Point Woronzof Tunnel." Concerning defendants' behavior, the panel concluded that "no material information was either inadvertently or deliberately withheld or misrepresented." The panel found the plans, specifications and design of the work were all reasonable.

With regard to FCCC's claims of entitlement, the panel concluded that FCCC was entitled to an equitable adjustment under the DSC clause of the contract. It noted that this conclusion would also satisfy the claim of unjust enrichment. The panel denied the remaining claims of breach of implied warranty and negligence.

In the accompanying Award, the panel, without further elaboration, "award[ed] a determination of entitlement to Frank Coluccio Construction Company." It then noted, "Because it is the determination of the Panel that this decision is not entirely in favor of any one party hereto, the costs of this arbitration, consisting of the statements for services of the Arbitrators, shall be borne 50% by plaintiff and 50% by defendants."

### C

MOA moved to have both the Findings and the Award confirmed as the arbitrators' "award" pursuant to AS 09.43.110.[3]

---

2. This document was based on an "Initial Written Decision."

3. AS 09.43.110 provides:

> Upon application of a party, the court shall confirm an award unless within the time limits imposed by AS 09.43.120 and 09.43.130

In the alternative, MOA sought to have the Award confirmed, but modified pursuant to AS 09.43.130 to include the Findings in their entirety.[4] FCCC opposed this motion, and filed a cross-motion to have only the Award confirmed pursuant to section 9.43.110. It argued in the alternative that any inclusion of the Findings in the award should excise those portions critical of FCCC. The superior court issued an order confirming both the Findings and the Award on June 2, 1989.

In August 1989 the parties filed cross-motions for entry of judgment on the confirmed award.[5] As with the confirmation motions, MOA sought a judgment that incorporated the panel's criticisms of FCCC. FCCC sought judgment merely on the issue of MOA's liability for breach of contract as well as a directed verdict to that effect for use in the upcoming jury trial on damages. FCCC also asked the court for an order prohibiting "the parties, witnesses, and counsel from introducing evidence of, referring to, or in any other way making known to the jury, the decision of the previous arbitration proceedings, including the findings of fact, the conclusions of law, and facts of written decision." CH2M Hill separately moved for its dismissal as a defendant on the ground that the panel had decided against FCCC on all the claims against CH2M Hill; FCCC opposed this motion.

On November 30, 1989, the superior court issued a number of orders to resolve all outstanding issues in anticipation of trial. The court ordered that experts could rely on so much of the arbitrators' Findings as dealt with MOA's liability, but could not "testify about, or rely on, the arbitrators' findings dealing with the issue of mitigation." Any expert opinion on FCCC's failure to mitigate must be based on admissible evidence presented at trial. The court concluded that the "mitigation issue will be determined by the jury at trial and the burden of proof will be on the defendants."

The court further held that the "arbitration panel award, which is akin to a verdict on the issue of liability, is clear that the only issue upon which a final determination was made was plaintiff's 'entitlement' to damages." The court's review of the record led it to conclude that "the arbitrators gave the mitigation issue only cursory treatment." Accordingly, the court held that, admissibility and relevance notwithstanding, "to admit the arbitrators' award, the findings of fact and conclusions of law, and the arbitrators' initial written decision would lead the jury to confusion, would be misleading, and would be unfairly prejudicial to the plaintiff. Evidence Rule 403." The court prohibited parties, witnesses and counsel from referring to the Award and Findings in the presence of the jury.

The court next entered judgment in favor of CH2M Hill and dismissed all claims against it. CH2M was awarded attorney fees in the amount of $112,000. Finally, the court entered judgment in FCCC's favor as to the issue of liability. "The plaintiff is entitled to an equitable adjustment in its contract price to the extent that it can establish what damages, if any, it suffered as a consequence of its encounter with the differing site conditions in performing its contract with defendants."

Trial was held from December 6 through December 20. The jury returned a verdict in FCCC's favor of $2.11 million.

## II

The primary substantive dispute on appeal involves MOA's dissatisfaction with

grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in AS 09.43.120 and 09.43.130.

**4.** The grounds on which modification may be made are "evident miscalculation of figures or an evident mistake in the description of a person, thing, or property"; award "upon a matter not submitted to" arbitrators; and formal im-

perfections in the award "not affecting the merits of the controversy." AS 09.43.130.

**5.** AS 09.43.140 provides:

Upon the granting of an order confirming, modifying or correcting an award, a judgment or decree shall be entered in conformity with the award and be enforced as any other judgment or decree.

the superior court's handling of the arbitrators' decision. Specifically, MOA attacks the form of judgment entered on the award, the refusal of the superior court to give "res judicata and claims preclusive effect" to the Findings, the refusal of the superior court to give evidentiary effect to the Findings, certain of the court's jury instructions, and the method by which the court allowed FCCC to prove its damages.

## A

As noted above, the superior court confirmed the Findings and the Award as the award of the arbitrators pursuant to AS 09.43.110. In entering judgment on the award, however, the court limited itself to stating that judgment was entered in favor of FCCC and against MOA as to liability. Contrary to MOA's wishes, the court made no reference—and thus gave no legal effect—to those portions of the Findings which indicated that FCCC did not act reasonably and prudently in its preparations for constructing the tunnel.

■ Arbitration is "essentially a creature of contract, a contract in which the parties themselves charter a private tribunal for the resolution of their disputes." *Nizinski v. Golden Valley Electric Ass'n*, 509 P.2d 280, 283 (Alaska 1973) (quoting *Astoria Medical Group v. Health Insurance Plan of Greater New York*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 403, 182 N.E.2d 85, 87 (1962)). We have consistently held that the law favors arbitration with the minimum of court interference. *E.g., id.; Anchorage Medical & Surgical Clinic v. James*, 555 P.2d 1320, 1321 (Alaska 1976). These basic principles suggest that the parties are entitled to an award and judgment that accords with their arbitration agreement. Furthermore, to the extent that there is ambiguity in whether the arbitrators' comments are "dicta" or "holdings," they should be analyzed in the context of the parties' contractual agreement to arbitrate.[6]

With regard to the nature of the case and the questions to be submitted to the arbitrators, the agreement provides:

1.3 The claims as alleged in the lawsuit are essentially for breach of contract and unjust enrichment as against MOA and for negligence in the preparations of plans and specifications and breach of implied warranty of plans and specifications against CH2M.

1.4 Defendants MOA and CH2M have answered and denied any and all liability for damages alleged by FCCC. Substantial discovery has been taken in this case to date.

1.5 It is the intent of the parties to submit all liability/entitlement issues arising out of plaintiff's complaint and defendants' answers to binding arbitration.

The parties currently agree, in MOA's words, that "[t]he question of damages was reserved for subsequent jury trial."

■ Setting aside FCCC's other claims, it is clear from the agreement that FCCC claimed a breach of contract and MOA denied any breach. The "liability/entitlement" issue for the arbitrators would then be, "Was there a breach of contract?" FCCC alleged that MOA's refusal to grant an equitable adjustment of price for FCCC's encounter with a DSC constituted a breach. Because MOA concedes that it refused the equitable adjustment and does not contest that the contract requires such an adjustment in the event of a DSC, the question of whether there was a breach of contract is congruent with the question of whether there was a DSC. The panel's answer, broadly, was that there was a DSC, though not necessarily to the extent that FCCC claimed.

The arbitrators' choice to answer a "yes or no" question with "yes, but ..." does not change the fact that the parties agreed to ask a yes or no question: "Was there a breach of contract?" The legally operative answer was "Yes," a fact of which the arbitration panel was aware. The arbitra-

---

6. "Generally, the interpretation of a writing is a task for the court." *Alyeska Pipeline Service Co. v. O'Kelley*, 645 P.2d 767, 771 n. 2 (Alaska 1982).

As a question of law, then, the standard of review is *de novo*. *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987).

tors made clear in the "Initial Written Decision" their view that the "but" portion of their answer was a "[r]ecommendation" to "be considered during the evaluation of quantum" of damages. Their ultimate "Conclusion of Law" in the Findings was "that FCCC is entitled to an equitable adjustment of its contract price to the extent that it can establish damages." This *conclusion,* in accordance with their authority under the arbitration agreement, is a simple "yes/no" statement on liability, making clear that the question of damages remains.

In attempting to fit its argument into the constraints of the arbitration agreement, MOA very briefly contends—as it did below—that "failure to mitigate [damages] by [a] contractor is a liability issue." As support for this proposition, MOA cites *Lewis v. Anchorage Asphalt Paving Co.,* 579 P.2d 532, 533 (Alaska 1978) (*Lewis II*). *Lewis* in fact involved opposing claims of breach of contract: The contractor sued for withheld payments, and the client counterclaimed for breach of express and implied warranties that the work would be completed in a workmanlike manner, claiming damages over and above the withheld amounts. *Lewis v. Anchorage Asphalt Paving Co.,* 535 P.2d 1188, 1190 (Alaska 1975) (*Lewis I*). Thus, the issue of the contractor's reasonableness in *Lewis* was in fact a "liability" question. The crucial difference between *Lewis* and this case, however, is that the contractor's unreasonable actions were alleged to be a breach of contract. In no sense can *Lewis* be said to stand for the general proposition that "mitigation of damages" is a "liability" issue. In fact, neither *Lewis I* nor *Lewis II* makes any reference to either the term or the concept of "mitigation of damages."

■ We have accorded wide latitude to arbitrators in deciding what issues are arbitrable. *University of Alaska v. Modern Construction Inc.,* 522 P.2d 1132, 1138 (Alaska 1974). There is little evidence here, however, that the panel undertook to *arbitrate* the reasonableness of FCCC's action. The appropriate process for determining the presence of a DSC is for the court—or, as in this case, the arbitration panel—to "place itself 'into the shoes of a reasonable and prudent contractor.'" *P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913, 917 (Fed.Cir.1984) (quoting *H.N. Bailey & Assoc. v. United States,* 449 F.2d 387, 390, 196 Ct.Cl. 156 (1971)). A DSC exists if the actual conditions of the site differ materially from what such a contractor would have expected based on indications in the contract. *Shank–Artukovich v. United States,* 13 Cl.Ct. 346, 350 (1987). The panel followed this process precisely, with the conclusion that the actual conditions were not foreseeable to a reasonable and prudent contractor. In so doing, the panel noted its view that certain of FCCC's actions did not conform with those of a prudent and reasonable contractor. These comments are understandable under the circumstances, without compelling the conclusion that the arbitrators—technical, not legal, experts—were undertaking to make a decision binding on the parties.

■ In their Award the arbitrators split the costs of arbitration evenly between plaintiffs and defendants, "[b]ecause it is the determination of the Panel that this decision is not entirely in favor of any one party hereto." MOA suggests that this reinforces its view that the panel intended for its comments on FCCC's prudence to "limit" FCCC's entitlement. Such an argument might make sense outside the context already outlined. Here, however, it is a strained reading of the Award. Out of four claims of *liability* against MOA and CH2M Hill, FCCC prevailed on only one. This fact explains what the panel meant in saying that the decision was not entirely in favor of any one of the parties. MOA's view, however, cannot account for the Award's simple statement that "the undersigned Panel awards a determination of entitlement to plaintiff Frank Coluccio Construction Company." Had the panel intended to limit the entitlement that it did find, it very easily could have said that it "awards a determination of *limited* entitlement." We see no reason to read that

added word into the arbitrators' otherwise plain statement.[7]

### B

MOA argues that the Findings should have been entered into evidence on the issue of mitigation of damages and that its experts should have been allowed to rely on the Findings in calculating to what extent FCCC was responsible for its extra costs. In large part, MOA constructs this argument on the assumption that it will prevail on its earlier arguments that judgment should have been entered on the mitigation of damages issue and that the Findings dealing with FCCC's prudence should have preclusive effect. The argument thus fails for the reason that it does not in fact prevail on those earlier issues.

■ MOA also asserts that the court abused its discretion in excluding any reference to the Findings under Evidence Rule 403.[8] The superior court held that admission of the Findings "would lead the jury to confusion, would be misleading, and would be unfairly prejudicial to the plaintiff." This argument, too, falls back on the same reasoning used in MOA's other arguments. MOA says, for example, that "[i]t is incongruous to rule that a party to litigation can be prejudiced by the evidentiary effects of a judgment entered in that same litiga-

tion." Brief for Appellant MOA at 48. The point is, of course, that judgment was not entered on the issue of mitigation, nor should one have been.

Moreover, MOA's repeated reference to the panel's comments on FCCC's prudence as a "judgment" on the issue makes clear why the superior court reasonably concluded that introduction of the "Findings" would confuse and mislead the jury. The superior court obviously feared that the jury members might feel that they were bound to accept the panel's conclusions on FCCC's prudence, even if those conclusions conflicted with their own. The court thus did not abuse its discretion in excluding the Findings from evidence.[9]

### III

FCCC relied on what it characterizes as a "modified total cost" method to prove its damages at trial. As its expert explained at trial, "In a modified total cost [analysis], ... [t]he normal procedure is to look at all the money that was spent, subtract all the money that was paid, and then take a deeper look." In other words, the damages are calculated by starting with the contractor's costs in excess of what it was paid, then attempting to back out any costs that are not attributable to the DSC.[10] The superi-

---

7. MOA argues that the arbitration decision should have been given claim preclusive and issue preclusive effect and should have been considered *res judicata* on the issue of mitigation of damages. These arguments are easily disposed of. *Res judicata* cannot apply in the absence of "a judgment to which *res judicata* could attach." *C.J.M. Construction, Inc. v. Chandler Plumbing and Heating, Inc.,* 708 P.2d 60, 61 n. 1 (Alaska 1985). Similarly, one of the requirements for claim and issue preclusion is resolution "by a final judgment on the merits." *Rapoport v. Tesoro Alaska Petroleum Co.,* 794 P.2d 949, 951 (Alaska 1990). As the superior court's refusal to enter judgment on the question of mitigation was correct, it follows that the court correctly denied preclusive and *res judicata* effect to the parts of the Findings dealing with mitigation of damages.

8. Alaska R.Evid. 403 provides:
   Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consider-

ations of undue delay, waste of time, or needless presentation of cumulative evidence.
   "The standard of review of a trial court's decision to admit evidence is abuse of discretion." *Hutchins v. Schwartz,* 724 P.2d 1194, 1197 (Alaska 1986).

9. MOA also alleges error in the court's denial of two proposed jury instructions which embodied those aspects of the Findings which were excluded from evidence. In fact, proposed instruction W was a verbatim excerpt of a large portion of the Findings. MOA's argument is essentially that the trial court's refusal to grant the proposed instructions was error for the same reason that its other contested decisions were error. It thus fails for the same reasons.

10. In this case, FCCC's expert found a total cost to FCCC of over $8.9 million. He subtracted an "under bid amount" for a modified total cost of about $8.6 million. After subtracting from this modified total cost an amount paid of about $5.1 million, the expert concluded that FCCC's damages were about $3.5 million.

or court allowed use of this method over MOA's objection. MOA renews its objection before this court.

As FCCC itself admits, the total cost method of proving damages is universally disfavored. *E.g., Boyajian v. United States*, 423 F.2d 1231, 1235, 191 Ct.Cl. 233 (1970).[11] We recently joined this chorus of disapproval. *Fairbanks North Star Borough v. Kandik Constr., Inc.*, 795 P.2d 793, 798–99 (Alaska 1990), *reh'g granted on unrelated issue*, 823 P.2d 632 (Alaska 1991). FCCC is at pains to point out that its proffered method is not the "total cost" method, but rather the "modified total cost" method, which it asserts "has been widely adopted, nationwide." The first case it cites as support for this distinction is *New Pueblo Constructors, Inc. v. State*, 144 Ariz. 95, 696 P.2d 185, 194 (1985). What the Arizona Supreme Court actually said, however, was that "[i]t is misleading to refer to this as a separate 'method' for determining damages." *Id.* 696 P.2d at 195. Even "modified," the total cost method is only used as "a last resort," and then only under "close judicial scrutiny." *Id.* at 195, 196.

■ The preferred method of damages calculations is the so-called "actual cost" method, in which each element of extra expense incurred because of the DSC is added up for a total claimed amount. *See, e.g., J.D. Hedin Constr. Co. v. United States*, 347 F.2d 235, 259, 171 Ct.Cl. 70 (1965); *Laburnum Constr. Corp. v. United States*, 325 F.2d 451, 459, 163 Ct.Cl. 339 (1963); *State Highway Comm'n v. Brasel & Sims Constr. Co.*, 688 P.2d 871, 877 (Wyo.1984). Courts have also allowed a "jury verdict" method, a variant on the actual cost approach which allows the contractor to "present evidence of the cost of additional work to the finder of fact[,] including any actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects." *New Pueblo*, 696 P.2d at 194; *see also North Slope Technical Ltd. v. United States*, 14 Cl.Ct. 242, 262 (1988) (applying jury verdict method in DSC context).[12]

■ Courts have generally adopted a four-part test to determine whether a total cost methodology should be allowed to prove a contractor's damages:

> The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

*Boyajian*, 423 F.2d at 1243 (quoting *WRB Corp. v. United States*, 183 Ct.Cl. 409, 426 (1968)) (emphasis removed). Both parties agree that this test applies here. The burden of proving that each prong is met is on the contractor. *New Pueblo*, 696 P.2d at 196.

■ On appeal, MOA does not question the applicability of prongs (2) and (3). It challenges the applicability of prong (4), but on the grounds that FCCC's expert impermissibly disregarded the arbitrators' "findings of fact" concerning FCCC's prudence. To the extent that this argument rests on MOA's general position that the entire Findings were binding and admissi-

---

11. *See also, e.g., Moorhead Constr. Co. v. City of Grand Forks*, 508 F.2d 1008, 1016 (8th Cir.1975); *J.D. Hedin Constr. Co. v. United States*, 347 F.2d 235, 246–47, 171 Ct.Cl. 70 (1965); *New Pueblo Constructors, Inc. v. State*, 144 Ariz. 95, 696 P.2d 185, 194 (1985); *Clearwater Constr. & Eng'g, Inc. v. Wickes Forest Indus.*, 108 Idaho 132, 697 P.2d 1146, 1150 (1985) (dictum); *Omaha Pub. Power Dist. v. Darin & Armstrong, Inc.*, 205 Neb. 484, 288 N.W.2d 467, 474 (1980); *State Highway Comm'n v. Brasel & Sims Constr. Co.*, 688 P.2d 871, 877 (Wyo.1984).

12. The jury verdict method amounts to little more than the principle, often stated by this court, that "a contractor need not prove damages with mathematical precision, [but] may only recover those damages which it proves with reasonable certainty." *Kandik*, 795 P.2d at 798; *see also L.L. Hall Constr. Co. v. United States*, 379 F.2d 559, 566, 177 Ct.Cl. 870 (1966) (noting "well-established rule" that "an absolute determination of the precise excess costs" is unnecessary, so long as "an approximate and reasonable determination may be made ... in such amount as, in the judgment of fair men, resulted from the breach").

ble, it fails for the same reason the general position fails.

■■■■ MOA's challenge to prong (1) is not so easily dismissed, however. Before a contractor may rely on a total cost method, it must show that such a method is the only one available under the circumstances. *See, e.g., J.D. Hedin,* 347 F.2d at 247; *cf. City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 224 n. 29 (Alaska 1978) (approving jury instruction that puts on plaintiff the burden of showing damages "by the best measure that can be used under the circumstances"). MOA argues that FCCC could have—and thus should have—used an actual cost method. MOA points out that its own expert was able to make an actual cost estimation of damages. Finally, it alleges that "FCCC made no attempt to relate its claim for specific increased costs ... to the differing site condition."

FCCC rejects this last allegation as a "gross mischaracterization[ ]." FCCC asserts that its expert was prepared to present an actual cost analysis, but was not allowed to do so on the "limited grounds" that he had not prepared the analysis before the end of discovery. It also maintains that it did in fact introduce evidence of its actual costs "through original accounting records and through the testimony of its comptroller Ann Meek." [13] In summary, it asserts with little amplification that it "did *not* exclusively rely upon [Modified Total Cost] to prove its claim.... Only because Coluccio could not possibly prove *all* of its losses by this method, did it also employ the [Modified Total Cost] method." Brief of Appellee FCCC at 57–58 (emphasis in original).

FCCC has clearly failed to bear its burden of showing that "the nature of the particular losses make it *impossible or highly impracticable* to determine them with a *reasonable* degree of accuracy." *Boyajian,* 423 F.2d at 1243 (emphasis added). In fact, it admitted at trial that its expert "had been able to put together an actual cost analysis," though he only did so after he had been deposed and after the close of discovery. It reaffirms that admission before this court, but maintains that the total cost method is still allowable in that actual cost analysis would not include *"all"* its losses.

There is no authority that FCCC cites—and our research has revealed none—that supports the proposition that use of total cost analysis is appropriate if an actual cost analysis would not include all losses. As should be clear from the discussion above, the law is quite the contrary: Total cost analysis is generally impermissible unless alternative methods of analysis would not identify any losses. In a case very similar to this one—involving changed conditions in construction of a sewer tunnel—the Seventh Circuit noted:

> Plaintiff presented its damages in a very detailed accounting, as the difference between the actual costs incurred, adjusted downward for events unrelated to the changed condition, and its bid....
>
> ....
>
> Plaintiff, by selecting and compiling all the costs of certain items that directly related to the changed condition, has rhetorically labeled its cost presentation as reasonable because this selective process does not include "all" of the costs. However, the "total cost" concept, even when

---

13. FCCC later argues that it offered actual cost evidence by "present[ing] a 'checks and invoices' case through introduction of its original accounting records, explained by their custodian Ann Meek." This characterization stretches the content of Meek's testimony. Although she did identify apparently voluminous accounting records and describe FCCC's accounting system, her quantitative testimony consisted primarily of testifying that "the total cost" was $6,813,893 and that FCCC was paid $5,093,013. Regardless of whether the "checks and invoices" could be used to determine actual costs arising from the

DSC, Meek admitted on cross-examination that she had undertaken no such analysis. When MOA objected to admission of such a mass of accounting materials, FCCC's counsel conceded that "[i]t certainly wouldn't be our attempt to send these into the jury room and have the jury read every line of it, except to the extent they wanted to check it." On appeal, however, FCCC asserts that "[t]he jury took the books of account into their deliberations with them, and, judging from the verdict, obviously made use of them."

applied to selective items and rhetorically labeled "reasonable" based on selectivity of items, cannot be accepted. *Fattore Co. v. Metropolitan Sewerage Comm'n,* 505 F.2d 1, 3, 5 (7th Cir.1974) (footnotes omitted). In this case FCCC made a similar presentation, but labeled it "modified." As in *Fattore,* however, the method is unacceptable absent a showing that it is the only one available.

This conclusion, however, is not dispositive of MOA's appeal. Had the jury heard only FCCC's modified total cost theory and returned a verdict in the amount indicated by that theory—$3.5 million—reversal would be mandated. *Kandik,* 795 P.2d at 798–99. However, the jury also heard MOA's actual cost analysis and returned a verdict of only $2.1 million, less than two-thirds of the amount asked for by FCCC. Courts have generally approved "jury verdict" awards, whether rendered by the judge or a jury, under similar circumstances—that is, where the contractor has sought to rely on a total cost approach, but the fact-finder has apparently gone beyond that method and rendered a verdict that seems fair and reasonable and is supported by substantial evidence. *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.,* 898 F.2d 512, 519 (7th Cir.1990); *Nebraska Public Power Dist. v. Austin Power, Inc.,* 773 F.2d 960, 968 (8th Cir.1985); *Fattore,* 505 F.2d at 5; *Omaha Public Power Dist. v. Darin & Armstrong, Inc.,* 205 Neb. 484, 288 N.W.2d 467, 475 (1980).

*Omaha Public Power,* like the present case, involved a construction project in which the contractor encountered unexpected soil conditions. *Omaha Public Power,* 288 N.W.2d at 469. The contractor presented total cost evidence to support its damages claim. *Id.* at 473. The defendant objected to use of the total cost method, *id.* at 472–73, and claimed that any costs beyond the contractor's compensation were due to the contractor's inefficiency, lack of experience and underbidding, *id.* The trial judge accepted the total cost method as to part of the contractor's claim, but awarded a lesser amount than claimed. *Id.* at 473–74. Noting that the trial judge was actually using the "jury verdict" method, the Nebraska Supreme Court held:

> Even in situations where courts have rejected the total cost method of proving damages, where the record contains reasonably satisfactory evidence of what the damages are, computed on an acceptable basis, the court has adopted such other evidence, at least where the evidence is sufficient upon which to predicate a "jury verdict" award.

*Id.* at 475.

Similarly, in *Fattore* the trial judge considered the contractor's total cost analysis, but awarded a reduced amount. The appeals court upheld the award:

> "Jury verdicts" have always been supported if there was clear proof that the contractor was injured and there was no more reliable method for computing damages[,] provided that the evidence adduced was sufficient to enable a court or jury to make a fair and reasonable approximation.

*Fattore,* 505 F.2d at 5. Here, even though FCCC has not established that total cost is the only method available, neither is there any indication that actual cost analysis by itself is adequate. In short, this case is one which requires "a fair and reasonable approximation" based on all the evidence of costs and expenditures.

In *Nebraska Public Power,* the Eighth Circuit considered a case in which the jury had been offered both "individual claims" [14] and total cost theories of damages. From the jury's special verdict form, it apparently chose to award damages based on the individual claim theory. *Nebraska Public Power Dist.,* 773 F.2d at 968–69. The losing party argued that presentation of the total cost evidence may have impermissibly influenced the jury. *Id.* at 968.

---

**14.** The court used the term "individual claim theory," but in context appears to mean essentially the same as "actual cost": "The district court judge submitted Nebraska Power's claims against Austin to the jury on the individual claim theory of recovery. The jury was instructed ... to determine from the evidence the total actual damages attributable to [each individual] claim." *Nebraska Public Power Dist.,* 773 F.2d at 965.

The court rejected this argument. It noted first that the trial judge's jury instructions clearly informed the jury that they should accept the total cost evidence only if the four-part test of its acceptability was satisfied in their minds, and that the contractor bore the burden of proving that the test was met. *Id.* It also noted that even when the method is not appropriate as a measure of damages, as evidence it is "probative, and does supply some evidence concerning the reasonableness of damages. Moreover, the jury's verdict indicates that it was able to, and did, use the total cost evidence only as a factor in determining the damages to be awarded for the various delays." *Id.* (citations omitted).

In this case, the trial judge instructed the jury extensively on damages. Specifically, he told them in Instruction 31 that they should award damages only if they were "able to determine the amount of Plaintiff's losses with reasonable certainty, according to the best measure under the circumstances." The court told them in Instruction 32 that FCCC had the burden of proving damages with "enough evidence for you to make a reasonable estimate of damages without speculation, guess or conjecture." These strictures were essentially repeated in Instruction 35:

> In deciding the amount of damages that the Defendants must pay to the Plaintiff, you must keep in mind the following rules:
>
> First, that your general goal should be to put the Plaintiff in as good a position as it would have been in had the Plaintiff not encountered a differing site condition.
>
> Second, you must have a reasonable basis for fixing the amount of damages. The Plaintiff is not required to show its damages with mathematical exactness, but you must have a reasonable basis for fixing damages in this case. A mere guess is not enough.
>
> In all such cases where a party to an action asks for monetary damages, the burden is upon that party to show that it has been injured, and also, with reasonable certainty and by the best measure that can be used under the circum-

stances, the amount of the compensatory damages which it claims. The Plaintiff must prove its damages by a preponderance of the evidence.

The judge also specifically instructed the jury on the four-part test for acceptability of the total cost theory and clearly stated that all four factors had to be established before applying the theory.

The jury thus received instructions on damages perfectly in accordance with Alaska law. *See Whittier Fuel & Marine Corp.*, 577 P.2d at 222–24. Having received specific instructions on the applicability of FCCC's theory of damages, the jury members rendered a verdict for substantially less than FCCC asked and its analysis indicated. As MOA does not contend that the verdict is not supported by substantial evidence, the inapplicability of the total cost theory is not cause for reversing the jury's decision.

## IV

FCCC appeals the superior court's denial of attorney's fees incurred in the preparation of its administrative claim and its denial of expert fees in excess of the limits prescribed by Administrative Rule 7.

## A

As a prerequisite to initiating legal action to recover the excess costs imposed by the DSC, FCCC was contractually required to file an administrative claim with MOA seeking an equitable adjustment. In preparing this claim, the denial of which constituted the breach of contract for which MOA was held liable, FCCC incurred claimed costs of over $60,000, consisting primarily of legal fees. FCCC intended to introduce evidence of these costs at trial as an element of special damages. MOA moved to exclude the evidence, however, on grounds that attorney's fees are recoverable only pursuant to Civil Rule 82. The superior court agreed and excluded the evidence, holding that "[a]ll attorney's fees and costs issues will be determined by this court under Alaska R.Civ.P. 82."

After trial, FCCC included these prelitigation attorney's fees in a motion for Rule 79 costs. The superior court found that these costs were incurred by necessity. It further noted that it

> would award Coluccio some of the fees and costs requested if the case law supported such an award, [but] the Alaska Supreme Court's decisions do not support the proposition that this court has the discretion to do so. . . .
>
> . . . .
>
> Coluccio has also not presented a single Alaskan case which supports the recovery of attorney's fees incurred in pursuing an administrative claim as costs under Rule 79(b).

The court consequently denied any award on this aspect of FCCC's costs.

On appeal, FCCC first contends that the superior court erred in excluding evidence of the administrative claim costs from trial. It argues that these costs were "reasonably foreseeable" damages stemming from MOA's breach of contract, insofar as the contract required it to pursue the administrative remedy before pursuing any legal remedy. Its support for this contention consists of two federal contracts cases, discussed below.

The well-established principle in federal contracts cases is in fact the opposite: Legal fees associated with prosecution of a claim—as opposed to performance of the contract—are not recoverable as damages. *E.g., Singer Co. v. United States*, 568 F.2d 695, 720, 215 Ct.Cl. 281 (1977); *L.L. Hall Constr. Co. v. United States*, 379 F.2d 559, 569, 177 Ct.Cl. 870 (1966); *Appeal of S. & E. Contractors, Inc.*, AEC BCA No. 97–12–72, 74–2 B.C.A. (CCH) ¶ 10.676, at 50,698, 1974 WL 2264 (1974); *Power Equip. Corp.*, ASBCA No. 5904, 1964 B.C.A. ¶ 4025, at 19,808, 19,814, 1964 WL 814 (1964).[15] This includes the costs of preparing the administrative claim for equitable adjustment. *See Singer*, 568 F.2d at 720.

The crucial distinction is whether the legal costs incurred are "costs of performance" or costs associated with prosecuting a claim. In *S. & E. Contractors*, relied on by FCCC, the government itself ordered extensive changes and an accelerated performance of work. The Board of Contract Appeals held that legal costs resulting from these government orders were essential to performance and thus costs of performance. *S. & E. Contractors*, 74–2 B.C.A. at 50,695. This holding, however, does not stand for the proposition that *any* equitable adjustment claim is *per se* a cost of performance. In fact, the board mentions nothing about preparation of claims, and carefully separates out those legal fees incurred in the subsequent, extended dispute with the government. *Id.* at 50,698–99.

In a different case, the Armed Services Board of Contract Appeals did allow recovery of the legal fees incurred in developing and presenting a claim for equitable adjustment to a contracting officer. *Allied Materials & Equip. Co.*, ASBCA No. 17318, 75–1 B.C.A. (CCH) ¶ 11,150, at 53,066, 53,087, 1975 WL 1728 (1975). A subsequent litigant invoked that decision as establishing the principle that the legal fees incurred in developing and presenting a claim for equitable adjustment are always recoverable. The Court of Claims rejected this view. *Singer*, 568 F.2d at 720–21.

The court noted that *Allied Materials* involved a situation where government liability was not disputed and emphasized "the equally important fact" that the adjustment was necessary to completion of the contract. *Id.* at 721. It refused to expand the holding beyond that type of situation. *Id.* The new United States Claims Court recently reaffirmed, in disallowing a recovery of costs similar to those claimed by FCCC, that *Singer* "recognized a very limited exception to the rule against the recovery of claim preparation costs where there is both an acknowledgement

---

15. These cases involving the United States generally deal with the applicability of some statutory or regulatory bar to assessing attorney's fees against the federal government. *E.g., Singer Co.*, 568 F.2d at 720. They are nevertheless relevant to this discussion, as the fundamental question is identical: Were the costs incurred in the performance of the contract? *Id.* If not, then FCCC cannot claim them as "reasonably foreseeable" damages.

by the government of the contractor's entitlement and where the adjustment is made in the midst of contract performance." *Delco Electronics Corp. v. U.S.*, 17 Cl.Ct. 302, 333 (1989).

Neither of these factors is present in this case. MOA consistently denied any liability until the arbitration panel handed down its decision. Although the initial claim for equitable adjustment was made while work continued, the claim was obviously not crucial to completion of the project, as FCCC completed the tunnel without the adjustment dispute being resolved. Furthermore, FCCC continued to revise its claimed entitlement after the excavation was completed. Thus, the conclusion of the *Singer* court applies to this case as well: "Judged both from the standpoint of the time of their submission and the purpose of their submission, [the contractor's] requests for equitable adjustment were not performance-related; they bore no beneficial nexus either to contract production or to contract administration. Accordingly, the attorneys' fees are not recoverable." *Singer*, 568 F.2d at 721.

The second opinion relied on by FCCC, *Dawco Construction,* is not in conflict, although it does include an award for costs of preparing a claim. *Dawco Construction Inc. v. United States*, 18 Cl.Ct. 682, 701 (1989). In that case, the contracting officer required the contractor to submit successive versions of its claim under alternative costing theories, apparently without notifying the contractor that he would not allow any claim. *Id.* at 696–97. The court found that "[t]hese flip-flops by defendant, demanding first the submission of plaintiff's claim in one form, then another, and then yet another, was totally unnecessary and unjustified." *Id.* at 696. The court did not explain its inclusion of the claims preparation costs or cite to any supporting authority. It is clear from its discussion, however, that the court placed great weight on the fact that the contracting officer himself requested the work in the midst of performance without indicating to the contractor that he questioned its basic entitlement. *Id.* As such, the case is inapposite to the present situation, where MOA denied any DSC from the outset and thus requested no cost documentation from FCCC.

In sum, there is no support for the conclusion that the cost of preparing a claim for equitable adjustment is recoverable as a cost of performance in a situation such as the present case. Those costs are thus not available as an element of special damages. The superior court therefore correctly excluded proof of them from evidence.

FCCC does not make any attempt to claim entitlement to a portion of these costs under Rule 82. *Alaska State Housing Auth. v. Riley Pleas, Inc.*, 586 P.2d 1244, 1249 (Alaska 1978) ("Civil Rule 82 only applies to 'costs of the action' not attorney's fees incurred in the conduct of a prior" proceeding). It reasserts its argument below that the superior court should be able to award these attorney's fees as Rule 79 costs, analogizing to the recovery of paralegal fees referred to in *Smith v. Shortall*, 732 P.2d 548, 550 n. 1 (Alaska 1987). We do not see any basis for the analogy, nor does FCCC supply any.

The main thrust of its argument is that FCCC incurred these costs in a winning effort, so some mechanism should be found for allowing it to recover them. This proposition has no support in case law. The costs are attorney's fees—nothing more, nothing less. This court long ago held that Rule 82 is intended "only to partially compensate a client for the productive work done by his attorney." *State v. Abbott*, 498 P.2d 712, 731 (Alaska 1972). The partial nature of the compensation is evidenced, for example, by the schedule establishing the appropriate award in "average cases." Alaska R.Civ.P. 82(a)(1). It is also evidenced by the limitation of Rule 82 to costs arising from the action. FCCC's fundamental complaint—that it should be more fully compensated for the productive work of its attorneys on the ground that some of the work went into preparing a claim for equitable adjustment—is simply without merit in this context of partial compensation.

### B

■ After trial, FCCC sought to recover more of its expert witness fees than allowed under Administrative Rule 7(c).[16] Although FCCC sought over $130,000, the court applied the Rule 7 guidelines and awarded $475. In so doing, it noted that the case was "highly technical and complex" and "by necessity[ ] required the use of expert consultants and expert witnesses." The court relied on this court's holding in *Miller v. Sears*, 636 P.2d 1183 (Alaska 1981):

> Absent extraordinary circumstances, such as bad faith or reprehensible conduct, not existing here, the prevailing party may receive as costs only those expert witness fees specified in Administrative Rule 9(c) [current Rule 7(c)].... The intent of Rule 9(c) is to limit the fees which can be taxed as costs to those specified in the rule. Costs in excess of those specified or which do not meet the conditions of the rule are, like many other litigation costs, not recoverable from the losing party.

*Id.* at 1195 (footnote omitted). Finding no "bad faith or reprehensible conduct," the superior court felt constrained to deny any award above the Rule 7 guidelines.

FCCC argues that the examples of bad faith and reprehensible conduct were not meant to exhaust the possible "extraordinary circumstances" which justify departure from the Rule 7 guidelines. Rather, FCCC suggests that " 'extraordinary circumstances' should be any circumstance that the trial court, in its sole discretion, believes to be truly 'extraordinary,' and is willing to enter a special finding, on a case-by-case basis, to that effect." It argues that the superior court made such a finding in this complex, highly technical case. FCCC asserts that the purpose of the rule is to compensate, not to punish.

We disagree with FCCC's analysis of *Miller.* Our explicit reference in *Miller* to bad faith and reprehensible conduct is clearly a rejection of FCCC's compensation approach, *id.* at 1196 (Connor, J., dissenting), a rejection we have reiterated since. *See Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1036–37 (Alaska 1986) (overturning award of expert fees in excess of guidelines and stressing that the case did not involve "those extraordinary circumstances where the losing party should be punished").

The complexity of the case is irrelevant. We have previously rejected any award of expert fees at all in a case where no trial was held, citing the limitation in Rule 7 that "additional compensation shall not exceed $25.00 per hour while employed and testifying." *Atlantic Richfield Co. v. State*, 723 P.2d 1249, 1253 & n. 7 (Alaska 1986). There, the litigation involved a challenge to state tax laws, an obviously complex topic; over $2 billion in revenue hinged on the outcome of the case. *Id.* at 1250–51. After winning on summary judgment, the state sought, among other things, compensation for experts in excess of $330,000. *Id.* at 1253. Despite these manifestly "extraordinary circumstances," we applied the letter of Rule 7 and denied any recovery for expert consultants' fees. *Id.* (citing *Tundra Tours*, 719 P.2d at 1020; *Miller*, 636 P.2d at 1195). We thus affirm the superior court's award of expert fees in the present case.

### V

■ MOA cross-appeals on three issues, only one of which need detain us.[17] MOA asserts that the award of some $21,000 in Rule 79 costs should be reversed and remanded "for further hearings in which FCCC will have the burden of identifying

---

**16.** Administrative Rule 7(c) states in relevant part that "[r]ecovery of costs for a witness called to testify as an expert is limited to the time when the expert is employed and testifying and shall not exceed $50.00 per hour."

**17.** The first issue in MOA's Cross–Appeal brief is predicated on FCCC's appeal of the court's use of the Rule 82(a)(1) schedule for award of attor-

ney's fees. FCCC has not appealed that award; the issue is therefore moot. The third issue addressed in the Cross–Appeal brief is predicated on our granting FCCC's request for remand on the issue of expert witness fees. Because we have rejected that request, this issue also is moot.

those costs" incurred in prosecuting the contract claim against MOA, as opposed to those incurred in prosecuting the unsuccessful tort claims against CH2M Hill.

The argument as presented here is frivolous. MOA asserts that, "[i]n a multi-claim, multi-defendant case where the moving party won on some claims and lost on others, a Rule 79 request for costs must be appropriately apportioned so that *only* those costs incurred as part of the moving party's winning claims will be the subject of an award of costs." Cross–Appellant's Brief at 20–21 (citing *Bovee v. LaSage*, 664 P.2d 160 (Alaska 1983)). In fact, *Bovee* involved a *single* defendant, who won on *all* claims and whose questioned costs were in an entirely separate action. *Id.* at 164–65. The case says absolutely nothing about the burden on a plaintiff who wins a $2.1 million suit against one of two original defendants. MOA cites no other case in the text of its argument on this issue.

▇▇▇ We will overturn an award of costs only if the superior court clearly abused its discretion. *Kaps Transport, Inc. v. Henry*, 572 P.2d 72, 77 (Alaska 1977). Here, the litigated claims involved intertwined issues of negligence and breach of contract for which the plaintiff sought the same corpus of damages— namely, its added expense in dealing with the DSC. MOA makes no showing that the superior court clearly abused its discretion in finding that the challenged costs were reasonably necessary for pursuit of the claim against MOA, other than such broad allegations as that FCCC's "deposition costs were incurred either for general discovery purposes or with regard to the tort claims against CH2M Hill for breach of warranty and misrepresentation." Such a conclusory statement does not begin to meet MOA's heavy burden on appeal. We therefore affirm the superior court's award of Rule 79 costs.

## VI

▇▇▇ After the arbitration panel found in favor of CH2M Hill as to all claims against it, the superior court granted it summary judgment. The court also award-ed attorney's fees of $112,000, out of a requested total of over $150,000. The court specifically noted:

> In determining the appropriate amount to partially compensate CH2M Hill for attorney expenses it incurred in defeating all the causes of action asserted against it by Coluccio, this court has carefully considered the following factors: the liability exposure, the duration and complexity of this litigation which arose out of a highly technical construction project, and the extent and value of the services rendered by CH2M Hill's attorneys. A close scrutiny has been made by the court of the summary of billings submitted by CH2M Hill to assure that only those fees reasonably and necessarily incurred were considered. To the extent that work performed by more than one attorney was duplicative and unnecessary, it was not considered in determining a proper award of attorney fees.

The court rejected FCCC's contention that CH2M Hill's participation in the case was "minimal, duplicative and unnecessary" as "not supported by the evidence." The clerk subsequently awarded CH2M Hill costs of over $14,000. The court denied FCCC's motions to reconsider these awards. FCCC now appeals, asking this court to reverse and remand the awards of fees and costs with instructions that CH2M Hill bear the burden of proof of "appor-tion[ing] with specificity" between the costs and fees incurred in defending itself and those incurred in defending MOA.

FCCC's appeal, which in some cases might have some validity, is in this case balanced precariously on a falsehood and a fallacy. The falsehood is that MOA and CH2M Hill entered into an agreement whereby, in FCCC's words, "MOA contrac-tually assumed primary responsibility for *the defense of both itself and of its agent* CH2M Hill." MOA and CH2M Hill did indeed enter into a "Joint Defense Agreement." But nothing in the agreement assigns MOA "primary responsibility" for defending CH2M Hill. In fact, the agreement specifically provides that "[t]he cost

of defense of Claims III and IV, and any additional claims which may be brought directly against CH2M Hill by FCCC, are the responsibility of CH2M Hill, and the costs of defending against these claims shall be segregated by the engineer in a separate cost accounting system and *not* billed to the MOA." (Emphasis in original.)

The main point of the agreement appears to be arranging compensation for CH2M Hill to the extent that its *engineers* aided in MOA's defense. The agreement particularly notes and preserves any and all legal claims that the two defendants might have against each other arising out of the FCCC suit. Finally, the agreement specifically makes provisions "[t]o facilitate the rendition of professional legal services to each party by its own lawyers." Clearly, it is incorrect to say that CH2M Hill gave over its *legal* defense to MOA. It was in both parties' interest to cooperate, but that hardly creates any presumption that CH2M Hill's lawyers minimally participated in the defense of the company.

The fallacy implicit in FCCC's argument is that a plaintiff can sue co-defendants for claims of $3.5 million—for which they may or may not have eventual claims of indemnity against each other—then complain that they did not coordinate their legal efforts for maximum economic efficiency. CH2M Hill faced a tremendous amount of liability in a highly complex case. It had no responsibility to FCCC to economize on otherwise reasonable and necessary fees and costs merely because another party also faced the same risks.

The superior court explicitly considered the factors this court has previously identified as pertinent in establishing a reasonable amount of attorney's fees. *Atlantic Richfield Co.*, 723 P.2d at 1252 ("court shall consider all relevant factors, including the nature and value of services rendered, the duration and complexity of the litigation, the novelty of the issues presented, [and] the amount in controversy"). The court also specifically noted that it did not take into consideration those fees it deemed duplicative and unnecessary. *State v. Fairbanks North Star Borough School Dist.*, 621 P.2d 1329, 1335 (Alaska 1981). It had the opportunity to review the fees award in light of FCCC's joint defense theory, and declined to alter the award. The court's determination is not "manifestly unreasonable." *Tundra Tours*, 719 P.2d at 1037. We therefore affirm the award of attorney's fees to CH2M Hill.

AFFIRMED.